UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| VANESSA AOUN, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CITY OF LAS VEGAS, ) <br> ) <br> Defendant. ) | Case No.: 2:22-cv-01751-GMN-EJY <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 25), filed by Defendant City of Las Vegas. Plaintiff Vanessa Aoun filed a Response, (ECF No. 27), to which Defendant filed a Reply, (ECF No. 28). For the reasons discussed below, the Court **GRANTS** Defendant's Motion for Summary Judgment.

**I.    BACKGROUND**

This case arises from Defendant's alleged discrimination and retaliation against its city park employee, Plaintiff Vanessa Aoun. (*See generally* Compl., ECF No. 1). Plaintiff began her employment with the City in 2003 and worked in various positions until her recent termination in September 2023. (Resp. 2:3–5, ECF No. 27). Plaintiff, a 61-year-old woman with a "bad back" and "bad knees," alleges that the City discriminated against her based on her age, gender, and disability. (Pl.'s Dep. 37:4–12, 76:1–9, Ex. B to Mot. Summ. J., ECF No. 25-11). Due to her health complications, Plaintiff occasionally used a walker at work and had a handicap placard in her car. (*Id.* 19:7–22:15; 76:1–77:5).

Plaintiff also had two surgeries during the relevant time period. In October 2021, Plaintiff took 12 weeks of leave for knee surgery under the Family and Medical Leave Act ("FMLA") while working for the City. (*Id.* 82:19–83:2); (Director Ford Dep. ¶ 31, Ex. A to Mot. Summ. J., ECF No. 25-1). When the 12 weeks of FMLA leave expired at the end of

December, the City granted Plaintiff several additional weeks of leave without pay, until February 16. *(Id.* ¶¶ 31–33). And in January 2022, Plaintiff had back surgery to implant a spinal cord stimulator. (Pl.'s Dep. 82:19–83:2, Ex. B to Mot. Summ. J.). On February 18, Plaintiff's doctor released her back to work with temporary restrictions, which were lifted on March 22, 2022. (Director Ford Dep. ¶ 36–38, Ex. A to Mot. Summ. J., ECF No. 25-1).

### A. Plaintiff's Work Performance and Discipline

Plaintiff worked as an "Administrative Support Assistant" whose primary job was processing timecards for department employees. (Pl.'s Dep. 63:25–64:7; 94:21–25, Ex. B to Mot. Summ. J.). Defendant kept track of the errors Plaintiff made while processing timecards and submitted a report demonstrating that from July 2020 to July 2021, while Plaintiff was responsible for processing 107 timecards, her error rates were between 15% to 96%. (Timecard Errors, Ex. A-2 to Mot. Summ. J., ECF No. 25-3). This caused Plaintiff's coworkers and supervisors to review her work, identify errors, and make corrections. (Supervisor Quintana Dep. 23:5–28:24, Ex. C to Mot. Summ. J., ECF No. 25-12). In July 2020, Plaintiff received an oral reprimand because her timekeeping error meant that an employee's shift was not covered, so several parks were delayed in opening and maintenance had to be deferred. (Oral Reprimand, Ex. A-3 to Mot. Summ. J., ECF No. 25-4); (Director Ford Dep. ¶¶ 18–19, Ex. A to Mot. Summ. J.).

Plaintiff had multiple meetings with supervisors to discuss her job duties and errors and received additional training, workflow charts, checklists, and screenshots of the timekeeping software. (Supervisor Quintana Dep. 23:11–27:20, 36:5–37:21, Ex. C to Mot. Summ. J.); (Supervisor Meeting Dates, Ex. A-4 to Mot. Summ. J., ECF No. 25-5). At the end of 2020, Plaintiff's former supervisor removed a percentage of the timecard work that Plaintiff was responsible for, extended deadlines, and reassigned her other tasks so that Plaintiff could devote

more time to processing timecards. (Supervisor Quintana Dep. 36:5–37:21, Ex. C to Mot. Summ. J.).

Plaintiff continued making mistakes, however, so the city began imposing disciplinary action under the Collective Bargaining Agreement. (*Id.* 20:8–22). In August 2020, Plaintiff received a written reprimand. (Written Reprimand, Ex. A-5 to Mot. Summ. J., ECF No. 25-6). Plaintiff commented that she accepted responsibility for her mistakes and would "diligently strive to not make mistakes." (*Id.*). But, due to continued errors, she was placed on a Performance Improvement Plan in December 2020 with the goal of reducing her error rate to 5% or less. (Plan, Ex. A-6 to Mot. Summ. J., ECF No. 25-7).

In August 2021, the City informed Plaintiff that it would be considering additional discipline due to her ongoing poor work performance. (Not. of Discipline, A-7 to Mot. Summ. J., ECF No. 25-8). The City explained that during the 60-day implementation of the Performance Improvement Plan, plus a two-week extension, "there was not significant improvement to qualify as successful." (*Id.* at 3). And in the five months following the 60-day plan, Plaintiff's timecard error rates were between 14.95% and 96.26%. (*Id.*). The City provided Plaintiff with union representation and issued a one-day suspension due to her poor performance. (Supervisor Quintana Dep. 44:4–16, Ex. C to Mot. Summ. J.); (Not. Suspension, A-8 to Mot. Summ. J., ECF No. 25-10). Plaintiff did not file a grievance to challenge the discipline. (Pl.'s Dep. 168:12–18, Ex. B to Mot. Summ. J.).

After the suspension, Plaintiff met with the City Manager to discuss her work environment and supervisors' conduct. (Ans. Interrogatory 7:1–3, Ex. 1 to Resp., ECF No. 27-1). In her answers to Defendant's interrogatory, Plaintiff states that she was subjected to "a pattern of adverse and hostile conduct" from her supervisors. (*Id.* 6:9–10). She testified that her managers treated her more harshly than other co-workers, even though she believed she had the work skills to meet her employment expectations. (*Id.* 6:11–23). She met with Dr. Hibbler,

a city executive, and told Dr. Hibbler that she was being harassed at work and was worried about retaliation based on her FMLA leave. (*Id.* 7:3–13).

Plaintiff was transferred to the Floyd Lamb Gatehouse for another employment position in April 2022. (Supervisor Radke 18:22–22:21, Ex. D to Mot. Summ. J., ECF No. 25-13). Plaintiff's most recent supervisor, Ms. Radke, testified that the City transferred Plaintiff "to meet its business needs" and believed the reassignment would improve Plaintiff's timecard error rate. (*Id.*). Plaintiff had previously told Radke that she wanted to work at the Floyd Lamb Park as it was closer to her home. (*Id.*). The new role provided Plaintiff with supervision over several hourly staff and oversight of cash handling and did not involve an adverse change in pay, seniority, or status. (Pl.'s Dep. 170:3–171:21, Ex. B to Mot. Summ. J.). Plaintiff, however, was upset by the involuntary transfer to the Gatehouse and believed it was done in retaliation. (Resp. 5:25–6:1). She stated that the Gatehouse was an "inhospitable environment," and that a lack of sealed windows and doors allow dust, pollen, and animal dander to enter the building. (*Id.*).

**B. Charge of Discrimination**

In June 2022, Plaintiff submitted a Charge of Discrimination to the Nevada Equal Rights Commission. (Charge of Discrimination, Ex. E to Mot. Summ. J., ECF No. 25-14). On the form, she indicated a date range of discrimination from March 2021 to March 2022. (*Id.*). In the space used to describe the particulars of her discrimination, she focused on: (1) being "over-supervised" in March 2021 due to her gender, (2) harassment by managers in June 2021, (3) receiving a written discipline in August 2021, (4) her one-day suspension caused by retaliation to her Human Resources complaints, (5) being told to report back to work or be terminated after her surgeries, (6) her involuntary transfer to the Floyd Lamb Gatehouse in April 2022 resulting in a "demotion in status and responsibilities." (*Id.*). Plaintiff has agreed to dismiss her state law claims of negligent supervision and intentional infliction of emotional

distress, and thus her remaining claims against Defendant involve discrimination in violation of the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, the Americans with Disabilities Act, and Nevada law. (Compl. ¶¶ 14–17); (Resp. 22:14–16).

## II.     LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.* "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and

citation omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.  In other words, the nonmoving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.     DISCUSSION

Defendant presents three theories on summary judgment: (1) Plaintiff's discrimination claims fail under controlling law, (2) Plaintiff has not disclosed an expert to support her claims, and (3) Plaintiff disclosed no computation of damages to support her claims. (Mot. Summ. J. 13:2–12). Plaintiff contends, among other things, that she "has been subjected to regular and frequent acts of discrimination, harassment, intimidation, retaliation, threats, and unequal treatment in an overall hostile work environment." (Compl. ¶ 15).[1] Because the Court finds that no genuine issue of material fact exists in any of Plaintiff's claims, the Court grants summary judgment for Defendant on all claims.

### A.     Gender Discrimination Claims under Title VII and NRS 613.330

Plaintiff's first claim concerns gender discrimination in violation of Title VII and NRS 613.330. (Compl. ¶ 15). She states that she was victim to a hostile work environment because of her gender. (Resp. 13:9–18).[2]

Title VII prohibits employment discrimination based on any of its enumerated grounds: "'race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21,

---

[1] Plaintiff's first claim for relief lumps together violations of the Age Discrimination in Employment Act, Title VII, the Americans with Disabilities Act and "Nevada Law." (Compl. ¶ 15). Plaintiff does not clarify which actions taken by Defendants pertain to which causes of action and makes broad statements referring to discriminatory conduct based on age, gender, and disability. Because Plaintiff's claims are not sufficiently clear to the Court based on the face of the Complaint, the Court will base its analysis on the arguments laid out in Plaintiff's Response.

[2] Even though Plaintiff also alleges that she suffered unequal and disparate treatment, (Compl. ¶ 15), her Response clarifies that her gender discrimination Title VII claim relates to a hostile work environment and retaliation. (*See* Resp. 13:9–17:5).

(1993) (quoting 42 U.S.C. § 2000e–2(a)(1)).  A prima facie case for a hostile work environment under Title VII requires a plaintiff to show (1) she was subjected to verbal or physical conduct because of her gender; (2) the conduct was unwelcome; and (3) the conduct "was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 871 (9th Cir. 2001); *Apeceche v. White Pine County*, 615 P.2d 975, 977 (Nev. 1980) (finding NRS 613.330 claims subject to the same standard as Title VII claims).  Courts look to the totality of circumstances and consider factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  A plaintiff must show that a "reasonable person" would find the work environment "hostile or abusive" and that the plaintiff in fact found it so. *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 421 (9th Cir. 2013).

   Viewing the evidence in the light most favorable to Plaintiff, the instances of gender-based conduct were not sufficiently severe or pervasive such that a reasonable person would find the work environment to be hostile.  In Plaintiff's list of evidence demonstrating a hostile work environment, she fails to claim that the close supervision of her work, critical statements, or disciplinary actions had anything to do with her gender. (*See* Resp. 15:18–16:25).  When asked in her deposition whether anyone who worked for the City had made negative comments about her gender, she replied, "I do not remember that specifically," but also shared that in a meeting, a co-worker made a comment before March 2020 that a male Administrative Support Specialist could do the job better than her. (Pl.'s Dep. 58:7–20, 63:16–65:25. Ex. B to Mot. Summ. J.).  This single comment is not sufficiently severe or pervasive enough to alter the conditions of Plaintiff's employment and was made before the relevant time period in this litigation. (*See* Resp. 2:20–21) (stating that her litigation focuses on conduct beginning in

2021). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on the issue of gender discrimination.

**B.    Age Discrimination Claims**

Plaintiff next alleges that Defendant violated the Age Discrimination in Employment Act ("ADEA") under a "disparate treatment" theory. (Resp. 17:4–9). "Under a 'disparate treatment' theory of discrimination, a plaintiff in an ADEA case can establish age discrimination based on: (1) 'circumstantial evidence' of age discrimination; or (2) 'direct evidence' of age discrimination. *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1049 (9th Cir. 2012). Claims based on circumstantial evidence are analyzed under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If an employee can establish a prima facie case of age discrimination, the burden shifts to the employer to show a legitimate and non-discriminatory reason for the disputed adverse action. *Id.* And if the employer satisfies that burden, it shifts back to the employee to prove that the employer's reason for the action was pretext for unlawful discrimination. *Id.* To establish a prima facie case of discrimination, a plaintiff must prove four elements: (1) she was at least forty years old; (2) she was performing her job satisfactorily; (3) she was discharged; and (4) she was "either replaced by [a] substantially younger [employee] with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination." *Id.*

Defendant, the moving party, has met its burden by presenting evidence to negate an essential element of the prima face case: that Plaintiff was performing her job satisfactorily. Defendant attached Plaintiff's timecard error report showing that from July 2020 to July 2021, Plaintiff's error rates ranged between 15% to 96%. (Timecard Errors, Ex. A-2 to Mot. Summ. J.). To address this error rate, Defendant set up meetings with supervisors and provided additional job training. (Supervisor Quintana Dep. 23:11–23, 36:5–37:21, 27:7–20, Ex. C to Mot. Summ. J.); (Supervisor Meeting Dates, Ex. A-4 to Mot. Summ. J.). When her error rates

continued, Plaintiff was subject to discipline including an oral reprimand, a written reprimand, a performance improvement plan, and a one-day suspension.  This documented poor performance leads the Court to conclude that Plaintiff's discipline, and ultimate termination, was not pretextual for age discrimination, but rather based on her performance.

The burden now shifts to Plaintiff to establish that a genuine issue of material fact exists and that the "poor performance" reason given by the City was pretext for discrimination.  She cannot rely "solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, she must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence. *See Celotex Corp.*, 477 U.S. at 324.  In her Response, Plaintiff states only that "it is clear that for twenty years of consistent City employment, this duration of her tenure indicates overall satisfactory performance, which was only recently cut short by the City's termination action." (Resp. 17:23–25).  Plaintiff did not cite or attach specific evidence demonstrating her overall satisfactory performance.

Plaintiff's testimony relating to age discrimination consists of a meeting in which Plaintiff, not her supervisors, brought up her age when her work performance was criticized, in addition to two comments made by co-workers.  Plaintiff testified that in July 2021, she was in a yearly reporting meeting with her supervisors that consisted of them criticizing her work. (Pl.'s Dep. 41:3–21, Ex. B to Mot. Summ. J).  Plaintiff told her supervisors that she had an exemplary record in past jobs and didn't understand how she could go from being a "great employee" to a "bad employee" in the one year that she worked in her new department. (*Id.*). It was in this context that Plaintiff told them her age. (*Id.*).  She also testified that one co-worker ran down a hallway screaming about her age and maiden name, and a second co-worker, who supervised her for one month, told Plaintiff that she reminded the co-worker of her mother. (*Id.* 44:11–49:25; 58:1–60:13).

This evidence alone does not present a genuine issue for trial. Plaintiff broadly states that she has "been unfairly accused of work performance problems which are untrue and unfounded all in an effort to continually discipline me . . . ." (Ans. Interrogatory 8:9–11, Ex. 1 to Resp.). But again, these conclusory allegations are not supported by additional factual data or evidence. Therefore, the Court GRANTS Defendant's Motion for Summary Judgment as to the ADEA claim.

### C. Disability Discrimination Claims

A plaintiff bears the burden of proving that he or she is disabled within the meaning of the Americans with Disabilities Act ("ADA"). *Wong v. Regents of University of California*, 410 F.3d 1052, 1063 (9th Cir. 2005). "In order to qualify for relief under the ADA, the plaintiff must show that: (1) she is a disabled person within the meaning of the statute; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job she holds or seeks; and (3) that she suffered an adverse employment action because of her disability." *Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1156 (9th Cir. 2000). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Courts consider the following factors when determining whether an individual is substantially limited in a major life activity: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 CFR § 1630.2(j)(2). The appendix states, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 CFR Part 1630 App., § 1630.2(j).

Plaintiff's Complaint and Response are unclear regarding which disability and adverse action this claim centers on. It appears from Plaintiff's Charge of Discrimination that this claim focuses on the events that took place from October 2021 to April 2022, when Plaintiff took FMLA leave for back and knee surgery. Plaintiff wrote, "[i]n January 2022, I was told to report back to work or be terminated. I complained to HR about disability discrimination. I was given a fitness for duty Workers' Comp form to complete, which my doctor completed. I was released back to work with work restrictions." (Charge of Discrimination, Ex. E to Mot. Summ. J.). The City granted Plaintiff's request for 12 weeks of FMLA leave from October 1, 2021, to December 29, 2021, and then extended the leave until February 14, 2022, upon her request. (Pl.'s Dep. 183:17–20, Ex. B to Mot. Summ. J.); (Director Ford Dep. ¶ 31, Ex. A to Mot. Summ. J.).

On February 18, 2022, Plaintiff's doctor released her to work with temporary restrictions. (Director Ford Dep. ¶ 36, Ex. A to Mot. Summ. J.). About a month later, on March 22, 2022, Plaintiff's doctor released her for full-duty work, without restrictions. (*Id.* ¶ 38); (Charge of Discrimination, Ex. E to Mot. Summ. J.). In April, Plaintiff was transferred to the Floyd Lamb Gatehouse. (Charge of Discrimination, Ex. E to Mot. Summ. J.). The Court assumes that the relevant "adverse action" was Plaintiff's transfer, which she was unhappy with. (*See* Resp. 4:7–11).

Defendant meets their initial burden of refuting an essential element in Plaintiff's claim: that her health problems qualify as a "disability" under the ADA. Defendant presents evidence that Plaintiff's back and knee problems were temporary impairments. (Mot. Summ. J. 19:6–20:12). Plaintiff testified that she occasionally used a walker at work, but that it depended on the day. (Pl.'s Dep. 77:15–78:4, Ex. B to Mot. Summ. J.). And while she underwent knee and back surgeries requiring four months of leave, she was released back to work without restrictions in March 2022, before the Gatehouse transfer. (*Id.* 184:17–20). Thus, Plaintiff's

health condition appears more similar to a broken limb, for which one receives surgery and has a recovery period but is able to return to work without further restrictions.

Plaintiff has not demonstrated that a material issue of fact exists as to whether her health condition qualified as a disability. She did not offer evidence that her knee or back surgeries were more than a temporary condition that she recovered from by March 2022. On the contrary, she stated that her doctor released her back to work without restrictions. And it is Plaintiff's burden to prove she is disabled under the ADA. But even if her condition was not temporary, Plaintiff did not allege in her Complaint, nor argue in her Response, that her impairment limited a major life activity in a substantial way. Thus, the Court GRANTS Defendant's Motion for Summary Judgment as to this claim.

### D. Retaliation under Title VII

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove that (1) she engaged in a protected activity, (2) her employer subjected her to adverse employment action, and (3) there was a causal link between the protected activity and the employer's action. *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). If the employee establishes a prima facie case, "the burden shifts to the employer to present legitimate, non-discriminatory reasons for the adverse employment action." *Nagar v. Found. Health Sys., Inc.*, 57 F. App'x 304, 306 (9th Cir. 2003). "Once the employer meets this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext for retaliation." *Id.* "Only then does the case proceed beyond summary judgment." *Id.*

In this case, assuming Plaintiff established a prima facie case of retaliation when she was disciplined for poor performance and ultimately transferred to the Gatehouse, the City met its burden of showing that it had a legitimate, nonretaliatory reason for transferring her. Plaintiff's former supervisor testified that Plaintiff was progressively disciplined for poor work performance, as allowed under the Collective Bargaining Agreement, only after her supervisors

spent additional effort and hours to re-train her on timecard processing. (Supervisor Quintana Dep. 20:8–22, 23:11–27:20, 36:5–37:21, Ex. C to Mot. Summ. J.). The City attached evidence of Plaintiff's consistent error rates, as well as the oral reprimand, written reprimand, performance improvement plan, and one-day suspension.

Radke, Plaintiff's most recent supervisor, testified that the City moved Plaintiff to the Gatehouse in a lateral transfer to meet its business needs and lessen Plaintiff's workload. (Supervisor Radke 18:22–22:21, Ex. D to Mot. Summ. J.). Radke also testified that Plaintiff requested to be transferred to Floyd Lamb Park because it was closer to her home. (*Id.* 19:24–25). When asked whether anyone else was considered for the transfer to the Floyd Lamb Gatehouse, Radke replied that it had to be an Administrative Support Assistant ("ASA"), that there were only two ASAs in the department, and that the other ASA handled recreation, not parks. (*Id.* 20:19–21:9). That left Plaintiff as the only ASA already working in parks, and Plaintiff told Radke that she loved Floyd Lamb Park, so Radke believed "that would be an ideal place for her." (*Id.*).

Plaintiff argues that the City's actions were pretextual and that Defendant transferred her to the Gatehouse because Plaintiff made complaints about a hostile work environment and fears of retaliation. (Resp. 12:8–19). Because Plaintiff does not have direct evidence that the City's motive was pretextual, her claim is based on circumstantial evidence. When a claim of pretext is based on circumstantial evidence, it must be "specific and substantial" to survive summary judgment. *See Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). The evidence must either "directly . . . persuad[e] the court that a discriminatory reason more likely motivated the employer or indirectly . . . show[ ] that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Plaintiff's evidence fails to establish a triable issue of fact as to whether the City's reasons for retaliating against her were pretextual. Plaintiff's argument that the City disciplined her and ultimately moved her to the Gatehouse relies only on the temporal proximity between her return from FMLA leave and the transfer. (Resp. 11:15–12:19). Timing alone, however, is insufficient to show pretext when the record supports Defendant's claims that she was disciplined for her poor work performance and transferred to another building based on the city's business needs and Plaintiff's park experience. *See Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (recognizing that temporal proximity does not necessarily "refute the government's proffered legitimate reasons" for an action); *Coszalter v. City of Salem*, 320 F.3d 968, 977–78 (9th Cir. 2003) (holding that courts should not consider the timing of an action without regard to its factual setting). The Court has considered Plaintiff's evidence and concludes that it does not undercut the City's proffered reasons for disciplining Plaintiff and transferring her to another building. Accordingly, the Court also GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim.

### IV.      CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 25), is **GRANTED.**

The Court kindly directs the Clerk of Court to close the case and enter judgment for Defendant City of Las Vegas.

**DATED** this __12__ day of January, 2024.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT